City Council here on the first case, so we'll hear Kiernan v. Southampton and Wilson. Morning. Morning. May it please the Court, my name is Jason Abelove and I am proud to have represented Lieutenant James Kiernan of the Southampton Town Police Department for these last four years. I think it's undisputed that Lieutenant Kiernan's career has been unblemished except during the term of Chief Wilson. And I wanted to speak with the Court about some issues that were raised by the District Court judges that I'd like to highlight in my oral argument today. First, with respect to the constitutionally protected speech, I know that the District Court focused its decision on my client's failure to support Wilson in his bid to become Chief. And indeed, that's not the only constitutionally protected speech that my client engaged in. He engaged in other constitutionally protected speech or failure to speak, as the case may be, during his tenure. And that included his failure to support Wilson's political agenda once he was already Chief. When did that occur? That occurred throughout the tenure, but certainly ending at the promotion of Captain. It started in and around September of 2011, continuing through the term. And the latest act was with the promotion of Captain Pierce when he was promoted to Captain. Wilson, I take it, wanted to reform things. He wanted to maybe reduce some of the staff, run a leaner department. Was that the idea? I believe that that was a stated idea, but the actual idea was people that didn't oppose his bid to be Chief were the people that were eliminated. And indeed, Councilman Nuzzi of the town himself acknowledged that there was real concern that Chief Wilson was going after his political opponents in his bid to be Chief. And that that was really at the heart of his reorganization plan. Tell us what the latest act of political speech engaged by your client with respect to not supporting his plan was. When was the latest act? In February of 2012, where initially he did not agree to go to the town board to support Mr. Wilson wanting to promote an ally named Lisa Costa. There was that act, and indeed, there was when the town board advised. There was a conversation at that time between them in which he said, I'm not going to support, go to the board to support Costa? There was a conversation where Mike. February 2012. No, well, the February 2012 had to do with the promotion of Pierce. Costa was in January, I believe that promotion was. What happened in February 2012? With the promotion of Captain Pierce, and my client did not go to the town board with respect. So when the board told Wilson that Pierce was going to be promoted over Wilson's objection, what Wilson did was he immediately linked it to my client. He said to the town board, Kiernan and Pierce are days away from being indicted. At that point in time, there was no investigations into my client. What was the act of political speech by your client in February 2012? My client refusing to use his perceived political influence as a Republican councilman to get the Republicans on the board to support Wilson's agenda. What you're being asked is, who did he tell that he wasn't going to support? Wilson was. Apart from the fact that he didn't do it, because he didn't do it from an earlier period. He wasn't supporting this at all right from the get-go. But you're saying that he told somebody, presumably. So how do you know, apart from the fact that he didn't support it, how do you know what the date was? Well, we know that Wilson was regularly bringing my client into the office in December and January and February. And saying, I need you to go to the board to support my agenda. And my client was saying, I'm not comfortable doing that. First of all, I don't have this power that you think I have just because I'm a committeeman. And second of all, I'm not comfortable using my position as a committeeman to do that. So, and again, I go back to Wilson immediately. There's no investigations at that time telling the town board that my client is days away from being promoted. Because he, because Pierce was being. Let's face it. The real problem you've got here is that Wilson supported your client's promotion in the fall of 2000. And I think it was 11, October 12, 2011. He was promoted to lieutenant. And then thereafter, there was this whole Sickles investigation. And Wilson, which you may think is a pretext, but Wilson didn't like the way that was handled and did an investigation. And there were disciplinary charges brought against your client, to which he pled guilty of 32 disciplinary charges. But he pled guilty to four of them. And under those circumstances, that can't be a problem because he pled guilty. So, and everything else can flow quite easily from the disciplinary charges. So, I'm trying to look for something to support your case here. I find it a little hard. Your Honor's question raises multiple points. First, when he came to promote my client, he said to my client, I'm promoting you, so you'll help me with the town board. Chris Nuzzi, the councilman for the town himself, said that Wilson promoted my client as part of a political bargain. With respect to the Officer Sickles investigation- Bargain that there was no bargain. I mean, I thought your client was opposed. My client- There was no bargain. He just promoted him. Well, he- In hopes that maybe this would help him. But that certainly wasn't an adverse employment action. No, Your Honor, but that's certainly the protected speech in the sense that Wilson even said to my client after the promotion, I only promoted you so you could help me with the town board. And then my client refused to do that, which is why it was after the Pierce promotion- He was trying to get all the support he could get for his actions. There can be a debate. A lot of this is, he said, she said, a little petty politics within the department. And that's the other flavor that comes through from this case. And so, but at any event, the bottom line is your client is promoted. Then he is suspended because there's an investigation. And then he's reinstated to lieutenant after the investigation is over, notwithstanding the four- that he pled to- or agreed to four of the disciplinary charges. So I'm trying to see Willie how he was hurt, how his career was affected negatively. Your Honor, the Sickles- The only thing I look at is he was promoted to lieutenant. Your Honor, the Sickles investigation is what's alarming because the incident with Officer Sickles happened four months before. Wilson admits that he knew about it three months before. And it's not until they promoted Pierce and Wilson himself said to the board that Kiernan stays away from being indicted. There were no open investigations at that time. The Sickles incident was well put to bed at that point in time. Then Wilson- All the disciplinary complaints, actions against your client arose from the Sickles investigation. No, Your Honor. In fact, the disciplinary charges arose from the subsequent investigations where they, nine months after they- nine months after the street crimes unit was closed down and shuttered, it was being used for detectives. They cut the locks. They staged photographs. I mean, every single officer in street crimes, none of them were interviewed about the condition of Officer Sickles. And the Sickles investigation doesn't happen until after the Pierce promotion. When Wilson himself says my client is days away from being indicted, he's got no investigation at that point in time. So then he undergoes a campaign to go after my client to find something to punish him, anything at all. And what they end up finding is that there was a clerical error on some of his time. I don't understand what the Pierce promotion really has to do with your client. What's the Pierce- You're sort of hinging everything that, you know, the key moment is when Wilson goes, wants the Pierce promotion. The board says, you know, I'm sorry, the other way around. The board wants the Pierce promotion. Wilson doesn't. And Wilson gets mad. What's that got to do with your client? Wilson wanted my client to go to the town board to intervene. He wanted his other officer, Iberger. And it was the Republicans on the- you can point us to that says in January, February 2012 or at any time that your client said no to Wilson. I'm not going to support Pierce for promotion to the town board. There's no I'm not supporting Pierce. But he's saying I need you to support my agenda, which included Pierce. Before the town board told Wilson- And the last conversation in the record when that occurred was when? January. And my client- Wilson did not know that Pierce was going to be promoted until he was told by the town board. And that's when he lost his temper. He told the town board their phones were tapped. People were being indicted. None of it was true. He made it up. And then he went afterwards and started to try to find evidence anywhere he could. And the evidence wasn't there. So they staged that evidence. And my client was really the victim of this campaign that nobody believes any of it is true. Nobody believes there were drugs strewn around the street crimes unit. Even at the end of Wilson's tenure, Wilson had no authority to act. And his last two acts after this town stripped his authority away was when my client was coming back. He sent an email saying take away his police car and take away his supervisory responsibilities. And the very last act was to email Officer Costa from his personal email after having no authority and said secret his file away and give it to someone else. And then that file ended up in Newsday. You have reserved a couple minutes, Rebecca. Yes, I have. I'll hear you then. I see that my time is up. Thank you very much. Good morning. Good morning. May I proceed? Go right ahead. My name is Cynthia Ogiello. I represent the Town of Southampton and the Town of Southampton Police Department. I actually had a whole bunch of stuff prepared, but I would like to address a few things that Mr. Abelov said, if I may. First of all, the January 2012 conversations, there's no support for that in the record at all that he claims happened. Second, Mr. Abelov has continued to claim that beginning in February, March, that's when the discussions took place and that he said the charges were pending and that no investigation was happening at that time. That's not true. The record at A129 states that in December of 2011, the investigations begun. So it really had nothing to do with any purported conversations. If there were any, and the record doesn't say that there are, in January of 2012. How is your understanding of the last time the plaintiff talked with Wilson about supporting or not Wilson's agenda? So from the record, it states that Mr. Wilson would regularly speak to all command staff and administration about not supporting an agenda, but promoting the objectives of the department. Right, but you understand, we have to read the record favorably to the plaintiff. So we have to put aside what Wilson said. What's your understanding of the plaintiff's evidence, his testimony, whatever, in the record about the last time he spoke with Wilson about not supporting Wilson's agenda? The spring of 2011, prior to and around the time that Mr. Wilson was given the Chief Justice. And that's from his deposition? Yes. So here, the district court was correct in that Mr. Kiernan did not engage in any political or protected speech. He merely was, he was asked to, allegedly he was asked to help promote and have Mr. Wilson become Chief. Even assuming that he was, you're arguing, I think your argument is that his promotion kind of broke any chain of causation. Correct. I don't know whether refusing to take a position when you are a party official, which is, in my view, problematic, and is refusing to intervene on behalf of the police chief with the town board, is a matter of public concern or something that would be actionable, would be protected speech or not. I mean, it's close. These questions are not easy, always, under Garcetti. But I think your point is that even if it was protected speech, the outcome would be the same. Correct. He was promoted, so he already knew, Chief Wilson knew at the time that Mr. Kiernan was promoted to lieutenant, that Mr. Kiernan was not supporting him. In addition, when he said he didn't support him, he didn't say it was for any reason other than he wanted to bring another candidate, and he wanted to have it promoted from within. And the person that he wanted promoted from within was also not a Republican. So to that point, the speech wasn't political or a matter of public concern. If the court has any other questions, I'm happy to rest on my papers. If you have any other, yes? Thank you. Your counsel for Wilson. Good morning. My name's Leo Dorfman. I'm counsel for Chief Wilson. Counsel addressed several of the points I was going to make. The only thing I wanted to follow up on was this notion that Mr. Kiernan's personnel file was somehow stolen from the police department. The record is clear from Lieutenant Pierce's testimony that, in fact, a copy of the file was made and taken to the Suffolk County District Attorney's office. The original of the file remained at the police department. So this notion that the file was somehow stolen is simply false. Similarly- Why aren't some of the things that happened to Kiernan in the category of adverse employment actions? I mean, the drafting of a felony complaint and the negative recommendation to the town board, conduct of an investigation. These are a lot more serious than some of the things that we recognize as being adverse employment actions. As to the drafting of the criminal complaint and the statements to the town board, I would say that these things are, well, first of all, the plaintiff had no knowledge of either one of these things at the time that it happened. There are criminal complaints drafted and not filed every day and not every time one of those things. It is kind of unsettling, wouldn't you agree? It might be unsettling if you find out about it after the fact, but unless it's drafted with the intention to cause an individual to feel like they should be prevented from speaking, then- Doesn't that cast in a harsh light some of the other steps that were taken? I mean, there's a lot of hostility here, and it's from the chief of police to one of his officers. Well, there's no doubt that some of the steps taken in this case were harsh, but every step of the way was supported by some information that the police chief received independently of misconduct on Mr. Kiernan's part. So from step one, the investigation started in December 2011- What did Mr. Kiernan end up pleading guilty to? He ended up pleading guilty to not taking proper steps to document the problems with Officer Sickles, and those are the things he pled guilty to had the town not settled and he had been found guilty of some of the other charges, it's undisputed that he could have been terminated. And as to the political speech, it's certainly odd, I guess, that a police officer is a political committee man, but it seems as though your client is the one who cast him in the role of a political actor by asking him to exercise political influence that he had or was perceived to have as a Republican committeeman. So why shouldn't one put together the fact that your client cast him as a political actor, asked him to function as a political actor, and took hostile steps as his boss when he failed to do that? And why shouldn't a jury decide that question? Well, Judge, it's certainly disputed that Mr. Wilson asked a plaintiff to act in a role- It's disputed. It doesn't help. It's disputed that he asked him to act in a role as a political actor. I don't think that the court has to accept that the steps that Mr. Wilson asked Mr. Kiernan to take are political as such. What Mr. Wilson asked him to do was to support him with the board, to let the department speak with one voice with the town board. That's not- I think it makes a great deal of sense that a police chief should be able to ask his officers to support his agenda. I mean, you have responsibility for running the police department, and you ought to be able to ask people to do it. But the allegation is that the plaintiff was asked to do so because and in his role as a political actor by your client. That's the allegation, and I think- There's some evidentiary support, isn't there? I mean, he was a Republican committee member. There are Republicans on the town board, and there are quotations from your client. I think, Judge, that's probably why the district judge assumed without deciding that he did engage in political speech and went on to decide the case on other grounds, and I think that the decision certainly stands on those grounds. On the investigation beginning in December of 2011, your colleague rightly pointed out some support from the record for that, but that was from Mr. Wilson's testimony. My understanding is the district judge suggested that there was some other evidence that the investigation didn't actually begin in 2012. For example, the case number was a 2012 case number. Again, we have to review the record in the light most favorable to the plaintiff, so shouldn't we in deciding this assume the investigation started in 2012? I don't think so, Judge. What you have in the record, you're right, is an index number showing when the file was opened in the computer, but the testimony that we have from Mr. Wilson that the investigation started in 2011, that he asked Sergeant Costa to start the investigation in 2011, that Sergeant Costa did start the investigation then, and that's in his affidavit. At A481, paragraph 26, I began an investigation in December 2011 to uncover the details of Sergeant Sickles' addiction. Paragraph 27, I tasked Sergeant Lisa Costa with conducting the investigation. Right, but that's just his say-so. Our obligation is to essentially reject all evidence that a jury would not be required to believe that's favorable to your client at this point and just look at the plaintiff's evidence. There's nothing to contradict the notion that he got the investigation started at that point and that his motivation in December 2011 before— In other words, just because it is a 2012 case number, it would not be reasonable for— In other words, your view is that that doesn't contradict what's in the affidavit. That's right, Judge. It's not contradictory evidence. It suggests at best that some portion of the investigation started in January or in February. The prosecutor wouldn't have known about that right away. I mean, there would be an investigation without his knowledge. Presumably, most investigations have a particular person. He wouldn't— The defendant is not notified right away. That's right. He wouldn't have known about it necessarily in December. He wouldn't have necessarily known about it when the investigation was, quote-unquote, you know, if you want to call it, officially started when the case file was opened. Was Costa included as well in this, or is it just Wilson? Costa gave deposition testimony that I believe is consistent with Mr. Wilson's testimony, but I can't point you to that right now. I apologize. I'm not sure I know why it matters all that much whether the plaintiff knows what machinations have been put in train by somebody who is for a reason of political retaliation because an adverse employment review put into somebody's file, that can be an adverse employment action, especially if it can ultimately lead to firing or to demotion or even to a threat of it or a prospect of it. So I'm not sure it matters all that much whether Kiernan knew what was happening when it was happening. The reason I point out the timing when the investigation started isn't on the issue of whether it was an adverse employment action. It's rather on the issue of what was the intention of Mr. Wilson when the investigation was started. And counsel suggests that the intention, because the— In its proximity to any political speech, I take it. That's right. And so the question is, can we draw an inference that the investigation was started on account of some political activity or some political speech? Here, if the investigation started two months before the claimed political activity or political speech, then we can't draw any kind of inference to that effect. What did you understand your adversary's claim as adverse action to be? In other words, you're saying, I take it, that there was no adverse action here ultimately, right? That things were done, there were things put in files, there was investigations open and so forth, but it never came to anything ultimately. That's right. So at the motion to dismiss stage, we made the argument that certain actions couldn't qualify as adverse actions underpinning a retaliation claim, such as the investigation, the disciplinary charges, and the subsequent suspension. And the reason for that was that Mr. Kiernan ultimately pled guilty to some of those charges. And so on the motion to dismiss stage, the district judge dismissed any kind of claim that could be based on those charges. So with that gone, my understanding at the summary judgment stage was that we were left with a certain limited number of actions, such as the almost arrest or the attempted arrest, which isn't really an attempted arrest because no one ever tried to arrest him, such as the statements made to town board members, which I think really are privileged because it was his job to make those statements and it was the town board's job to listen to his statements about personnel matters. There's this notion that statements to the press were somehow adverse employment actions, and so we've argued that those don't qualify as adverse employment actions. And in any event, my client had retired by the time he was making those statements and those press articles were published. When we deal with the issue of proximity, does it matter that the plaintiff is alleging that he was the subject of adverse employment actions because of his refusal to speak? That refusal to adopt a political, to espouse a political position is a First Amendment right, same as your ability to articulate one. But the refusal to do it is one that goes on over time, and you can always change your mind and speak on behalf of Chief Wilson. I think I understand what you're saying, Judge, but I would submit . . . What I'm saying is I'm not sure we have to localize it to a particular articulated statement by anybody because what you have is the assignment by your client to the plaintiff of a political role that he refuses to perform and an assignment to him of political influence that he refuses to exercise. I think, Judge, that if we don't try to at least localize it to some time period, then we're left with a potentially absurd result where if Mr. Kiernan is asked at some point in 2011 to support my client's agenda, so to speak, and then says no, then I think what you're suggesting would mean that if he just continues to not do anything for any period of time, then any action taken during that period of time could lead to an inference of retaliation. And so I think we have to hold the plaintiff to some time period, to some specific act or statement that he will speak or he will not speak, so that we can localize it and determine whether some action before it or after it leads to an inference of retaliation. Otherwise, we have this indeterminate period. If it was two years down the line, three years down the line, could Mr. Kiernan turn around and say, well, this whole time I have been not speaking, and he's just been holding that over my head. So I would urge the Court to look for an actual moment of political activity. Thank you. Thank you. Your rebuttal. Two quick points, if I may, Your Honors. First, with respect to when the investigation started, not only did it have a 2012 number on the investigation, but the SUP reports, which are the reports that he sent four out of 12 officers to get the day after the Pierce promotion, and after he told the town board my client was days away from being indicted. Why shouldn't a chief of police expect or even demand that his officers support his agenda for remaking the department that he's now responsible for? I don't believe that. I think that you have a First Amendment right politically to say if we're going to make certain changes that affect or touch upon the public concern, which certainly is the staffing of the town police department, that you do have the right to ‑‑ I don't believe that a chief has a right to make you go to the board to support that agenda. You have a right to stay silent. You have a right to actively oppose that agenda. That's your ‑‑ It's a general matter, though. If your boss tells you to do something, you do it. It's a general matter, right? I mean, that's one of the conditions of normally being an employee. And so this has this political aspect to it in the sense that he's asking them to go to the board. But if he says, you know, I want you to quit bickering in the office, or I want you to get in line with some of the proposals I have and support them. You know, I've heard your views. You're against me, but now that's over. I'm your boss. I want you to do X. And you refuse to do it. I mean, that would be chaos in the workplace, wouldn't it? If employees could just say, no, I'm not going to follow you. I don't agree with what you're doing. Well, there are certain orders, like go out and execute a search warrant, or certain orders that are police business. And there are certain orders that are constitutional violations. If he ordered my client to discriminate on the basis of gender or race or national origin, that wouldn't be an order that could be enforced. Similarly, if you're ordered to do something that your constitutional rights protect you from, that's not a proper order. In your reply brief, you don't contest that you've waived that which you didn't object to for the magistrate judge's report. That's right. I mean, I believe there's still facts underlying in the matter, but there's not a new defendant. Those claims are gone. Yes. Okay. Second, I've gone back and forth with the lawyers on the timing. You said there's a conversation in January 2012. They say the last conversation occurred summer 2011. That's what the district judge says. Point me to the place in the record. Page 657 of the record is an affidavit of John Sideratos, where he testifies that in January or early February of 2012, Wilson makes the comment that your Republican friends are killing me. That's what I thought you were talking about, actually. Go ahead. You got another one for me? Yes. Okay. So connected to that on 521 of the record is my client's affidavit, and he links the timing of Wilson saying, I only promoted you so I wouldn't have these town board issues to the same time of that Sideratos comment. Well, it actually says on another occasion. Yeah, but that's in the same time period. How do you know? It doesn't say that in the affidavit. Well, I do. And in addition, the councilman Nuzzi testifies on page, I'm just trying to get that page right now, At 651, 654, and 676, he links the activities of Wilson to my client opposing it, and the activities of Wilson going after my client for not supporting that Wilson's agenda. I want to be very clear on what you're claiming the adverse actions are here. If you could just tick them off for me. Yes, Your Honor. So initially, it's the launching of the investigation. First, Wilson comes out. Give me a date, say what it was, and go to the next one. February 9th, Pierce gets promoted. February 10th, he launches that investigation. He sends out a third of his senior officers to investigate not Officer Sickles and whether or not he was actually on drugs. Next one. Okay. Then he reports my client directly to IAB in February. On March 9th. That's around later in February? Yes. March 9th, 2012, three days after the Pierce promotion, Wilson sends the letter to the town board attempting to demote the plaintiff. One week later, after the town refused that request, Wilson sends another letter to the town board seeking to demote my client. Isn't that April? That's March. I think that's the second letter I believe is. Oh, that is April, Your Honor. I'm sorry. Then May 4th, Wilson suspends my client without pay. There's no results of any investigation at that time. He doesn't even tell the town board. He just suspends him without pay. Let me ask you this. When there is an investigation underway, isn't it normal to suspend a person? You don't have to wait for the results of the investigation. I believe you have to wait for the results of the investigation. And Councilman Nuzzi testified that Wilson's reasons were inaccurate. I'm sorry. Then I'm confused. I thought here that because there was an investigation underway, he was suspended pending the investigation. And I thought that he also ended up getting paid because he got all his leave during that time. He did end up getting paid. But at that moment, you're suspended without pay. You're not even aware of what you're being accused of. And in this investigation, nobody speaks to the office. The investigation, maybe you don't know at that point. Maybe they're working it out. There were things that had happened that could be the basis for investigation. But I think it's critical to look at that investigation, that you're investigating Sickles. But you don't talk to any of the officers that actually worked with Sickles. And you don't talk to my client. So the whole merits of the investigation, what's that got to do with political speech? Well, say you're right about that. But unless there's some basis for us to find causation, what good does it do you? On the day of the Pierce promotion, he says that Kiernan— But, again, I'm not following one of the Pierce promotions. I've been over this before. If I may. Go ahead. On the day, he says Kiernan is days away from being indicted. There's no investigations at that time. There's no facts to base that. He tells the board their phones are tapped. So then what does he do? He tries to find a way to indict my client. And he does this investigation. It's purely a sham. And then these continued actions. And it goes on with the cutting of the locks in the street crimes unit. We have these. And then my client's return. Thank you. Thank you all. We'll reserve decision. Thank you, Your Honor.